## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

JAMIE MIDDLEBROOK,        )
        )
        Plaintiff,        )
        )
v.        )        No. 07-2373-STA
        )
TENNESSEE DEPARTMENT OF        )
CORRECTION, ET. AL.        )
        )
        Defendants.        )

## ORDER OF DISMISSAL

On August 23, 2010, the Court conducted an evidentiary hearing in this matter pursuant to 28 U.S.C. §§ 1915(e)(2)(B) & 1915A(b). For the reasons set forth below, the Court holds that Plaintiff has failed to state any of her claims about the conditions of her confinement. Therefore, all of Plaintiff's claims are **DISMISSED**.

## BACKGROUND

### I.    Procedural History

Plaintiff has alleged causes of action pursuant to 42 U.S.C. § 1983 for violations of her constitutional rights due to conditions of confinement as well as state law tort claims against Defendants. During the relevant time period, Plaintiff was an inmate in the custody of the Tennessee Department of Correction ("TDOC") at Mark Luttrell Correctional Center ("MLCC") in Memphis, Tennessee. Plaintiff originally asserted a variety of claims about the conditions at the MLCC. The Court analyzed and dismissed many of these claims in two dispositive orders:

Order Granting in Part and Denying in Part the Defendants' Motion to Dismiss, May 6, 2008 (Breen, J.); and Order Granting Defendants' Motion for Partial Summary Judgment, Nov. 24, 2009.  At a status conference on May 11, 2010, the parties sought clarification from the Court about what issues remained for trial following the dispositive orders, and the Court directed the parties to brief their respective positions.

On August 13, 2010, the Court issued an Order on the Remaining Issues (D.E. # 135). The Court held that only claims based on conditions Plaintiff grieved within the statute of limitations and actually alleged in Plaintiff's judicial Complaint survived for trial.  Therefore, the following grievances and the prison conditions described therein gave rise to the remaining claims in the case: the unsanitary conditions at the facility (#180891), lack of recreation opportunities (#181353), pest infestation (#181496), ice (#181613), padlocks on cell doors (#182383), standing water in the showers (#182781), security in the library (#182958), and assault in the library (#183410).  In so far as the remaining claims were based on conditions Plaintiff grieved within the statute of limitations and those conditions were alleged in Plaintiff's judicial Complaint, the Court held that the claims were timely and properly before the Court.

The Court set an evidentiary hearing on the surviving claims to determine whether Plaintiff's remaining claims should be dismissed for failure to state a claim on which relief may be granted pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii).  The Court stated that the purpose of the evidentiary hearing was to present the Court with more information about the alleged conditions. Of the eight timely grievances, Plaintiff had never made three of them part of the record.[1]  The

---

[1] As the Court noted in its Order on the Remaining Issues, Plaintiff filed an Exhibit List disclosing the exhibits she intended to introduce at trial.  All of the grievances supporting her remaining claims were mentioned in the Exhibit List. (D.E. # 110, June 10, 2010).

Court also indicated that it needed more information about whether Plaintiff had exhausted her administrative remedies as to these conditions or whether the conditions in the eight timely grievances repeated earlier grievances which were now time-barred.

## II.      Evidentiary Hearing

At the August 23, 2010 evidentiary hearing, the Court heard arguments from both parties about the remaining issues and received testimony from all of the witnesses Plaintiff intended to call should the case have proceeded to trial.

### A.      Testimony of Jamie Middlebrook

The Court began by hearing the testimony of Plaintiff herself.  After being incarcerated at MLCC since 2004, Plaintiff was transferred to Tennessee Prison for Women in Nashville after suffering a stroke.  Plaintiff described some of the conditions at MLCC and produced the Inmate Grievance Response page of several grievances she filed at the facility.  First, Plaintiff stated that the indoor temperature at MLCC would reach over 100 degrees during the hottest months of the summer.  As a result, prison officials would provide inmates with ice for relief.  The facility did not provide fans but permitted inmates to purchase one fan of their own.  Plaintiff alleged that the PAWS Program, which allowed dogs to live with inmates, was discontinued in the summer months because of the excessive heat.  Second, Plaintiff testified to the unsanitary conditions found at MLCC.  Plaintiff stated that plumbing issues, particularly, toilets clogging and overflowing, were common.  Plaintiff admitted that she had observed this only two times during the relevant time period.  Plaintiff further testified that the laundry service at MLCC was ineffective because workers were instructed to dilute detergent and inmate clothing was never

thoroughly cleaned.

Third, Plaintiff stated that on one occasion an MLCC official denied Plaintiff's request to use a public restroom near the dining hall. Rather the official informed Plaintiff that she would need to return to her cell to use the toilet. Upon returning to her unit, Plaintiff was not permitted to enter her cell for some time even though she repeatedly requested entry. Plaintiff grieved the way in which the prison officials handled her request to use the restroom.[2] Fourth, Plaintiff detailed the problems with pests including rats, snakes, roaches, spiders, and ants at MLCC. According to Plaintiff, pest control contractors were called in to spray but never to treat inmates' cells.

Fifth, Plaintiff alleged that certain conditions at MLCC posed a serious risk to inmates in the event of a fire. The facility failed more fire drills than it passed. More importantly, guards cannot safely evacuate inmates from the facility because of the slide bolts and padlocks used to secure cell doors. Plaintiff stated that when keys to the padlocks could not be found, guards had to cut the locks off the doors. Sixth, Plaintiff testified that another inmate attacked her in the library. Plaintiff stated that no security is provided in the library and that inmates with violent

---

[2] Plaintiff argued at the hearing that this episode, alleged in grievance # 187527 dated February 27, 2007, was also alleged in her judicial Complaint and should be considered by the Court. The Court had found that Plaintiff's Complaint did not mention the incident described in the grievance. Thus, the Court held that the grievance was not properly before the Court. Order on Remaining Issues, August 13, 2010. At the evidentiary hearing, Plaintiff argued that the conditions in grievance # 187527 were stated in her Complaint where she alleged "disproportionate toilet/shower to inmate ratio (see Inmate Grievance dated November 30, 2005 attached hereto as Exhibit 'G')". Compl. ¶ 35g. The Court finds Plaintiff's argument to be without merit. This paragraph of her Complaint clearly refers to a grievance dated November 30, 2005; whereas, the grievance describing her denied request to use the restroom was dated February 27, 2007. Furthermore, grievance # 187527 makes no mention of an inadequate number of toilets or demand for additional facilities. Therefore, the Court declines to alter its previous ruling that this episode was not properly before the Court.

characteristics are free to move about in the library.  Finally, Plaintiff alleged that officials at MLCC failed to provide adequate recreational opportunities.

Plaintiff testified that all of these conditions were well known to officials including the individual Defendants.  Plaintiff stated that she had written numerous letters to many political leaders about the conditions at MLCC.   Plaintiff's grievances were sent the office of the TDOC Commissioner and returned with his signature.  Defendant Hodge responded to Plaintiff's complaints about rats by saying "You (sic) not at home."  Defendant Banks responded to reports of sexual assault by demanding proof and declaring that without proof  "he didn't want to hear it."

On cross-examination, Plaintiff admitted her lack of knowledge of the fire code and other applicable standards of the American Correctional Association ("ACA").  Plaintiff remarked that she could not understand how MLCC received ACA accreditation.  On re-direct, Plaintiff testified that she had talked to ACA inspectors during audits in 2006 and 2009 but was never asked about conditions of confinement.

### B.    Linda Lichtgarn

The Court next received the testimony of Linda Lichtgarn ("Lichtgarn"), an inmate at MLCC and an acquaintance of Plaintiff.  Lichtgarn has resided at the facility since 2000, living most of that time in the main compound.[3]  Lichtgarn stated that she had held a number of jobs at MLCC including newspaper editor, library aide, legal clerk, grievance clerk, and teachers aide.  As a legal clerk for eight (8) years, Lichtgarn prepared pleadings, briefs, and other papers for inmates.  As grievance clerk for two (2) years, Lichtgarn assisted inmates in completing

---

[3] MLCC consists of two primary parts, the main compound and the annex.

grievance forms and submitting grievances to the chair of the grievance board.  When an issue is grieved and not addressed, Lichtgarn stated that an inmate has no choice but to file the grievance again, and prison officials at MLCC permitted duplicate grievances.  According to Lichtgarn, the grievance board consisted of two inmates, two staff members, and a chairperson, with minutes kept by the grievance clerk.  Meetings varied in length.  Lichtgarn testified that she had witnessed Defendants Banks and Barbee "storm out of" grievance meetings.

Lichtgarn offered testimony about the conditions at MLCC.  Lichtgarn stated that indoor temperatures at MLCC could reach extreme levels during the summer.  There was no air conditioning and no ice provided.  Lichtgarn believed that inmates may have gone up to ten (10) days at a time without ice.  When the PAWS Program was still offered during summer months, dogs received ice in their water dishes even when inmates were not given ice.  As for unsanitary conditions, Lichtgarn testified that toilets would back-up and leave filth in many places.  Inmate clothing was laundered only twice per week, and detergent was diluted to save money.  Shower drains also clogged if more than two or three individuals used the showers at a time.[4]  To deal with the facility's vermin problem, officials issued sticky traps to be used in the cells. Concerning fire safety, Lichtgarn testified that inmates were informed of fire drills in advance, and yet the facility still failed most drills.  Lichtgarn claims that she had once been overlooked during a fire drill and left in her cell.  Lichtgarn had observed padlocks jam on cell doors forcing

---

[4] In support of Plaintiff's claim about the number of toilets, Lichtgarn stated that there was only one toilet for the classroom area to serve 60 to 70 inmates.  Lichtgarn herself had to obtain a letter from a doctor to go to the restroom when needed.  Because Plaintiff has not properly placed before the Court a claim about the number of toilets provided at MLCC, the Court will not address Lichtgarn's testimony on this issue.

guards to cut them off with a saw.  Lichtgarn was also a witness to Plaintiff's assault in the MLCC law library and testified that no security was present at the time of the assault.

During ACA inspections, Lichtgarn stated that she never spoke to inspectors because inmates were usually locked in their cells while inspectors were there.  According to Lichtgarn, Defendant Hodge violated MLCC policy by refusing to allow an outside electrician to come to the facility because Hodge knew that MLCC's system was not up to code.  Lichtgarn claimed that Defendant Barbee once sent inmates to his church to perform maintenance there.


### C.      Defendants' Expert Witness James R. Miller

Defendants' only witness at the evidentiary hearing was their expert witness, the TDOC director of compliance James R. Miller ("Miller").  Miller has held this position since 1995 and is responsible for inspecting prisons, conducting internal audits, and carrying out mock accreditation inspections.  Miller testified that the most significant problems uncovered by TDOC's annual inspections at MLCC were leaks in the roof, particularly in a year when the facility's gymnasium lost its roof during a storm.  Although the problem was corrected, Miller indicated that the problem was documented in the TDOC annual inspection for that year.  According to Miller, MLCC had no other significant problems and had an average number of deficiencies, about 15 per year out of 500 or 600 categories.  Per TDOC policy, the warden must submit an action plan or objections to annual inspection report in response to any deficiencies.  Miller stated that "one way or another each deficiency is resolved."  As far as management at MLCC, Miller testified that he never had any problems with officials and never experienced any pressure to make MLCC look better.

7

Miller is also a certified ACA auditor.  Miller testified about the ACA's standards for accreditations generally.  The ACA auditors check to insure that an institution has a system in place to correct problems by reviewing inmate grievances and inmate council meetings. Defendants entered as an exhibit the ACA inspection/audit ("Visiting Committee Report") for 2006.  During ACA accreditation inspections, the audit team chooses inmates for interviews.  In his experience, Miller stated that it was not uncommon for an inspector to go so far as to ask a prison official for additional privacy when speaking with an inmate.  Miller further testified that the ACA has mandatory standards for life, safety, and health of inmates.  The 2006 audit reported that MLCC was in compliance with 63 standards with three others not applicable, meaning that MLCC was compliant with 100% of ACA standards.  Miller added that MLCC's most recent ACA audit was conducted in 2009 and that MLCC was once again accredited.

With respect to the conditions of confinement and quality of life at MLCC, Miller stated that MLCC has no air conditioning but uses ventilation fans to keep the temperature "within acceptable limits."  In Miller's opinion, MLCC was clean and sanitary.  The facility maintained a pest control contract.  For fire safety, MLCC had alarms, sprinklers, and heat and smoke detectors.  Officials conducted periodic fire drills and monthly inspections.  An annual inspection is completed by the local fire marshal.  Miller opined that if any facility failed its local fire inspection, Miller would not allow an ACA audit to proceed until the deficiency was corrected.  Miller testified that MLCC provided a variety recreational activities and maintained treadmills and other table games for inmates.  Miller also believed that laundry service at MLCC was adequate.  Miller admitted that water is added to laundry soap because the detergent is shipped and packaged in concentrate, requiring that water be added.  Miller indicated that each

8

TDOC facility will evaluate the laundry products they purchase and change vendors if needed.

Miller testified in detail about fire safety issues and compliance at MLCC.  Miller explained that the facility uses padlocks in conjunction with slide bolts because the facility was not originally designed as a prison.  The Tennessee state fire marshal was involved in TDOC's decision to use padlocks.  Other prisons in Tennessee also use padlocks, such as Brushy Mountain Maximum Security.  Miller described the use of padlocks as a "use condition."  The National Fire Protection Association ("NFPA") uses the term "use condition" to describe a life safety condition for how an inmate gets from one area of a facility to another during a fire emergency, for example, where there is a fire wall giving inmates 30 minutes to evacuate before fire spreads.  According to Miller, a padlock constitutes use condition 5.  The Tennessee state fire marshal has approved the use of padlocks every year since TDOC put them into use.

Miller had reviewed the facility's evacuation plan for a fire and stressed the importance of the arrival of the keys.  The fire code provides only two minutes for emergency keys to arrive on each unit once a fire alarm sounds.  The emergency keys are in addition to the keys carried by guards.  ACA and NFPA standards require these back-up keys.  Prison officers are trained to identify correct keys in a dark or smoke-filled room.  Miller states that in his opinion padlocks on cell doors did not violate the life safety code, which are the fire codes developed by the NFPA.

As for Plaintiff's corrections expert, Miller testified that he had reviewed Joe Goodman's report.  Miller disagreed with Goodman's conclusion that the padlocks violated life safety code.  On the contrary, Miller stated that the means of locking up an inmate is not a violation per se.  A fire marshal looks at the use condition itself.  Miller discussed ACA fire safety standards such as

9

the state fire marshal's annual inspection and monthly and weekly inspections from trained inspectors. The 2006 ACA audit reported that MLCC complied with all of these standards. Miller opined that Goodman should have focused on more relevant ACA standards such as a facility's evacuation plan being certified by an independent outside inspector like the state fire marshal. Miller also emphasized that ACA standards focus on the need for immediate release of inmates from locked areas as well as a back-up system to get inmates unlocked. Here ACA auditors look for whether the state fire marshal has approved a facility's evacuation plan.

Finally, Miller stated that facilities receive prior notice of ACA audits in order to improve the audit process by allowing advance preparation and organization. Miller did not believe that the 2006 ACA audit at MLCC was faked or covered up. Miller believed that while ACA standards are a "beginning" for prison conditions, the standards were not minimal and "at times pretty difficult" to meet. The existence of work orders and other documentation at a prison is a good indication of responsiveness and attempts to maintain the facility. For example, MLCC has a pest control contract as required by TDOC policy and the company is called as needed. It would be impossible to provide inmates with their own bug spray because other standards prohibit their possession of flammable or caustic chemicals. Miller denied that MLCC staff had been unprofessional and opined that it was impossible to stop one inmate from randomly assaulting another inmate.

On cross-examination, Miller admitted that he was personally involved in inspections at MLCC only once per year. Miller stated that if a fire alarm was "not functioning," a facility would not receive ACA accreditation but added that a simple indication that one alarm needed maintenance might not necessarily mean that the whole system was "not functioning." In that

10

situation, an ACA auditor might ask the warden about the alarm and whether it was being addressed and when it was last tested.  Miller stated that if temperatures inside MLCC were consistently hot, then the condition would not be acceptable.  The state of Tennessee did not require that prison facilities have air conditioning.  Several institutions in the state of Florida do not have air conditioning.  Miller did admit that the PAWS program was discontinued because of the summer heat at MLCC.

With respect to fire safety and padlocking, Miller denied that a padlock on a cell door would make it hard to get inmates out.  Although a key may fail, the practice of conducting regular fire drills mitigates the risk.  Miller testified that he had personally observed roaches in MLCC and that if inmates were bitten by mice or spiders, there should be an attempt to correct the problem.  Miller reaffirmed his deposition testimony that it was not impossible to fake an ACA audit because "anybody can be fooled."  Miller clarified that ACA standards can be mandatory, for example life and safety issues, or non-mandatory.  TDOC strives to meet all standards, mandatory and non-mandatory, but it is not always possible to do so.  For example, ACA recommends that prison personnel records remain private.  Tennessee sunshine laws, however, require that these records be open to the public.

Miller commented on an MLCC annual inspection where TDOC found non-compliance with three requirements in maintenance, two in security, and two in fire safety.  The inspection commented that extensive cleaning was needed in the food service area.  The inspection noted obstructed exits and a lack of flow testing for fire hydrants.  The state fire marshal found seven

violations at MLCC.[5]  Miller explained that the fire marshal would approve the evacuation plan every year during his annual inspection.  Only changes in the plan would require review and approval of entire plan.  Miller denied that laundry service at MLCC failed to clean inmate clothing adequately.

### D.     Plaintiff's Expert Joe Goodman[6]

The Court heard the testimony of Plaintiff's expert witness Joe Goodman and received his report as evidence.  Goodman prepared his expert report without the benefit of Defendants' deposition testimony but stated that he had reviewed the depositions.  Nevertheless, Goodman had never supplemented his expert report to include any information from Defendants' depositions.  Thus, the Court limited Goodman's testimony to the scope of his original 66-page expert report dated January 20, 2009.  In the report, Goodman listed all of the materials he considered in forming his opinion such as Plaintiff's grievances, minutes from Inmate Council meetings at MLCC, and maintenance work orders.  The Court had previously ruled that any documents dated before May 1, 2006, were not relevant to Plaintiff's timely claims.  Goodman was not able to go through all of his notes and determine which of his opinions were based on excluded documents prior to the hearing.  Therefore, Goodman was not permitted to testify as to any opinions he formed based on such documents.

---

[5] The Court declined to admit the annual inspection report from April 2006 because it was outside of the relevant time period.  Plaintiff did make an offer of proof.

[6] Goodman testified on August 24, 2010, the second day of the evidentiary hearing and after Miller, Defendants' only witness, had testified.  The Court permitted Plaintiff to call witnesses out of order due to the fact that Goodman and a second witness for Plaintiff, Henry Isaacs, were not under subpoena to appear until August 24.

Goodman stated that he came to a preliminary opinion that some MLCC staff had engaged in outrageous conduct.  In particular, Goodman opined that padlocking cell doors was a "violation of most basic fire safety standards."  Goodman cited ACA publications, relevant case law, and the text of the Constitution itself.  Goodman admitted that he was not an attorney and had no expertise in applying the relevant legal standard to the facts of the case.  However, most of Goodman's opinions, including his opinions on fire safety, were conclusory and failed to explain how his testimony was "the product of reliable principles and methods."  On cross-examination, Goodman testified to his charges for his services in the case at bar.  Goodman admitted that he had never testified on behalf of a corrections defendant.  Goodman never talked to Plaintiff or any inmate at MLCC.  Goodman admitted that he had never participated or observed an annual inspection or ACA audit of MLCC.  Goodman stated that he had participated in two ACA audits.

### E.     Henry Isaacs

The final witness called by Plaintiff was Henry Isaacs, a counselor at MLCC and currently acting unit manager.  Isaacs testified that MLCC had no air conditioning when he arrived as an employee.  Isaacs stated that the facility issued ice to inmates when the ice machine was working.  An ice crew of inmates delivered the ice in mornings and afternoons during hot months.  Inmates regularly complained to Isaacs about not receiving ice, and so Isaacs believed that Defendants knew about the situation.  While Isaacs stated that he had not observed standing water in the showers, he had witnessed toilets back-up for up to two days at a time.  Isaacs added that showers had also backed up and in response the warden called in plumbers to correct the

problem.  Isaacs testified that when inmate laundry has come back dirty, he personally spoke to laundry workers to correct the problem.  Isaacs did not know whether other prison officials including Defendants addressed the laundry issue.  As far as pest infestation, an inmate once showed Isaacs her commissary bag with a hole where a rodent had apparently chewed the bag.  Isaacs had an experience of his own when mice got into a bag of potato chips in his office.  Isaacs stated that everyone at MLCC was aware of the pest and vermin problem.

Isaacs confirmed that padlocks had been used at MLCC since he began his employment there.  Isaacs believed that the facility did "pretty good" on fire drills, usually without advance notice and that "Mr. Echols does pretty good."[7]  Isaacs was not aware of an inmate being left in her cell during a fire drill, nor did Isaacs have knowledge of keys to padlocks being lost during fire drills.  Isaacs had seen the state fire marshal conducting inspections and stated that he was unaware of any safety issues the fire marshal may have overlooked.  Isaacs did not know whether the fire marshal ever met with any Defendant before the inspection occurred.

Isaacs testified that he had no personal knowledge of an inmate's attack on Plaintiff in the library but did state that there was no security officer posted in the library.  Isaacs had no knowledge of what actions Defendants took about security in the library.

Isaacs had limited contact with ACA inspectors during accreditation audits.  Isaacs opined that ACA inspections did not always reflect the day-to-day state of affairs at MLCC.  Isaacs testified that in his experience communication between staff and inmates was very poor at MLCC and led to conflicts.  Isaacs stated to the Court that he was not concerned about testifying on behalf of Plaintiff.

---

[7] Echols was not identified further.

## STANDARD OF REVIEW

Pursuant to the Prison Litigation Reform Act ("PLRA"), the Court is required to screen and dismiss complaints that are "frivolous or malicious," seek "monetary relief from a defendant who is immune from such relief," or fail "to state a claim on which relief may be granted."[8]  The screening requirement applies in all civil cases brought by prisoners, "whether the inmate paid the full filing fee, is a pauper, is pro se, or is represented by counsel."[9]  The Sixth Circuit has described the Court's duty as "a statutorily imposed gatekeeping function."[10]  Furthermore, the Court's role as gatekeeper continues "throughout the entire litigation process" under § 1915(e)(2).[11]  "A case that may not initially appear to meet § 1915(e)(2) may be dismissed at a future date should it become apparent that the case satisfies this section."[12]  To that end, courts have conducted evidentiary hearings to determine whether a prisoner's allegations about Eighth Amendment violations should proceed to trial.[13]

---

[8] *Barhite v. Caruso*, No. 09-1312, 2010 WL 1957493, at *2 (6th Cir. May 14, 2010) (citing 28 U.S.C. §§ 1915(e)(2)(B) & 1915A(b)).

[9] *McGore v. Wrigglesworth*, 114 F.3d 601, 608 (6th Cir. 1997), *abrogated on other grounds*, *Jones v. Bock*, 549 U.S. 199, 205, 127 S.Ct. 910 (2007).

[10] *Briner v. City of Ontario*, 370 F. App'x 682, 706, 2010 WL 1141152, at *22 (6th Cir. Mar. 26, 2010) (citing 28 U.S.C. § 1915A and 28 U.S.C. § 2254).

[11] *McGore*, 114 F.3d at 608 ("§ 1915A is applicable at the initial stage of the litigation, while § 1915(e)(2) is applicable throughout the entire litigation process.").

[12] *Id.*

[13] *E.g. Swaner v. Hailey*, 50 F. App'x 222, 223-24, 2002 WL 31473807, at *1 (6th Cir. Oct. 31, 2002) (noting where lower court had held evidentiary hearing to screen prisoner complaint pursuant to § 1915A).

<u>ANALYSIS</u>

## I.   *Exhaustion of Administrative Remedies*

Defendants have argued that Plaintiff failed to exhaust her administrative remedies as to several of the claims still before the Court, specifically because some of the conditions Plaintiff grieved in timely complaints duplicated earlier grievances, which the Court has held are now time barred.  Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") requires that prisoners must exhaust all available administrative remedies at the correctional facility in which they reside before they can bring § 1983 claims challenging prison conditions.[14]  "Exhaustion is mandatory and applies to suits with respect to prison conditions regardless of the type of relief sought."[15]  Interpreting the PLRA to require "proper exhaustion," the Supreme Court explained that "proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."[16]  The Supreme Court in *Jones v. Bock* explained, "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."[17]

---

[14] 42 U.S.C. § 1997e(a).

[15] *Vandiver v. Correctional Medical Services, Inc.*, 326 F. App'x 885, 888, 2009 WL 1175153, at *2 (6th Cir. May 1, 2009) (citing *Booth v. Churner,* 532 U.S. 731, 739, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); *Porter v. Nussle,* 534 U.S. 516, 520, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)).

[16] *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2386, 165 L.Ed.2d 368 (2006).

[17] *Jones v. Bock*, 549 U.S. 199, 217-19, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

The Sixth Circuit formerly required a PLRA plaintiff to plead claims with specificity and "show that they have been exhausted by attaching a copy of the applicable administrative dispositions to the complaint. . . ."[18]  The Sixth Circuit reasoned that the heightened pleading standard was required because "[d]istrict courts should not have to hold time-consuming evidentiary hearings in order simply to determine whether it should reach the merits" of a prisoner's § 1983 claims.[19]  More recently, the Supreme Court abrogated *Knuckles El* and the heightened pleading rule, concluding that exhaustion was an affirmative defense and not a pleading requirement.[20]  The Supreme Court never specifically stated that an evidentiary hearing was required to determine whether the prisoner had exhausted administrative remedies but that holding is arguably implied from its rejection of *Knuckles El*.

The Court holds that Defendants have not showed that Plaintiff failed to exhaust her administrative remedies as to her remaining claims.  At the evidentiary hearing, Plaintiff introduced the Inmate Grievance Response pages for a series of grievances, all filed within the statute of limitations for her § 1983 claims.  The Court finds that each of Plaintiff's grievances appears to have been exhausted at the facility by virtue of the fact that the Inmate Grievance Response pages were signed by the Grievance Committee and then the MLCC warden.  For their part, Defendants failed to produce any evidence of TDOC grievance procedure or what TDOC policy required to exhaust a grievance administratively.  Therefore, Defendants failed to carry their burden to show that the affirmative defense of exhaustion should apply in this case.

---

[18] *See e.g. Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000).

[19] *Id.*

[20] *Jones*, 549 U.S. at 205.

17

*II. Plaintiff's Timely and Administratively Exhausted Grievances*

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws."[21]  In order to prevail on such a claim, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law."[22]  "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred."[23]

The Eighth Amendment's prohibition on cruel and unusual punishment may be implicated where a prisoner's "conditions of confinement" include "deprivations of essential food, medical care or sanitation," "conditions posing a substantial risk of serious harm" or "other conditions intolerable for prison."[24] An Eighth Amendment violation giving rise to a § 1983 claim occurs when prison officials act with deliberate indifference to serious health needs or risks to the safety of those in custody.[25]  In order to sustain an action for deliberate indifference to a prisoner's serious health and medical needs, a plaintiff must make both an objective and

---

[21] 42 U.S.C. § 1983.

[22] *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

[23] *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001).

[24] *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392 (1981); *Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010).

[25] *Id.  See also Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

subjective showing.[26]  To satisfy the objective component, the plaintiff must allege that the health or medical need at issue is "sufficiently serious."[27]  "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, extreme deprivations are required to make out a conditions-of-confinement claim."[28]  "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."[29]  This requires the official's knowledge to fall somewhere above negligence but below knowing on the *mens rea* scale.[30] However, a defendant bears responsibility under §1983 if "'he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'"[31]  A prison official's mental state must rise to

---

[26] *See Farmer*, 511 U.S. at 834.

[27] *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing and quoting *Farmer*, 511 U.S. at 834).

[28] *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156  (1992) (internal quotations omitted). *See also Wilson v. Seiter,* 501 U.S. 294, 298. 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)  (stating that Eighth Amendment is implicated by the "unnecessary and wanton infliction of pain" and not "inadvertent failure to provide adequate medical care"); *Talal v. White,* 403 F.3d 423, 426 (6th Cir. 2005) (requiring that the prisoner demonstrate more than "mere discomfort or inconvenience").

[29] *Comstock*, 273 F.3d at 702.

[30] *See, e.g., id*. at 703 (stating that an official's failure to act on a "significant risk that *he should have perceived but did not*" does not give rise to a section 1983 claim); *accord Watkins*, 273 F.3d at 686 ("If an officer fails to act in the face of an obvious risk of which he should have known *but did not*, the officer has not violated the Eighth or Fourteenth Amendments.") (emphasis added).

[31] *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 843 n. 8).

"deliberateness tantamount to intent to punish."[32]

Applying these principles to Plaintiff's remaining claims, the Court finds that accepting Plaintiff's allegations as true and viewing the evidence presented in a light most favorable to her, there is no evidentiary basis from which a reasonable jury could conclude that she is entitled to relief.

## A.  Unsanitary Conditions and Pest Infestation

Two of Plaintiff's remaining claims concern unsanitary conditions at the facility (#180891) and pest infestation (#181496).  The unsanitary conditions Plaintiff complained about were more accurately the MLCC's problems with "vermin and pests."  As a result, the two grievances address substantially the same issues.   The Sixth Circuit has held that vermin infestation in a prison facility can violate the Eighth Amendment.[33]  For example, some courts have found that "[p]rolonged pest infestation, specifically a significant infestation of cockroaches and mice" may satisfy the objective prong of an Eighth Amendment violation.[34] However, "[t]he occasional presence of a rodent is insufficient to establish the objective component of an Eighth Amendment claim, which requires that a deprivation be sufficiently serious."[35]  Moreover, a plaintiff cannot make the subjective showing, that is a prison official's

---

[32] *Horn v. Madison County Fiscal Court,* 22 F.3d 653, 660 (6th Cir. 1994).

[33] *Wilson v. Seiter,* 893 F.2d 861, 864-65 (6th Cir.1990) (citations omitted), *vacated on other grounds by* 501 U.S. 294 (1991).  *See also* Order Granting in Part and Denying in Part the Defs.' Mot. Dismiss, May 6, 2008.

[34] *See Sain v. Wood,* 512 F.3d 886, 894 (7th Cir. 2008); *Antonelli v. Sheahan,* 81 F.3d 1422, 1431 (7th Cir. 1996) (allegation of "sixteen months of infestation and significant physical harm" stated claim for inhuman conditions of confinement).

[35] *Tucker v. Rose*, 955 F. Supp. 810, 816 (N.D. Ohio 1997) (rodents "never presented a significant problem" in the food service area).  *See also Chapman v. Knight*, No. 09-cv-00092,

deliberate indifference, where the official has attempted to cure the conditions even though unsuccessfully.[36]  The Sixth Circuit has remarked that ineffective efforts to "maintain decent conditions" at a facility amount only to negligence.[37]

    The Court holds that Plaintiff has failed to present sufficient facts from which a reasonable jury could return a verdict in her favor on this issue.  Plaintiff testified about a variety of pests and vermin that were found in the facility from time to time, especially mice, rats, spiders, and cockroaches.  Plaintiff even mentioned the presence of snakes.  Isaacs, a counselor and acting unit manager at MLCC, corroborated Plaintiff's claim that it was well known to everyone at the facility that mice and other pests were an ongoing problem.  The Court need not determine whether Plaintiff has presented sufficient evidence to satisfy the objective standard that the pest problem at MLCC was sufficiently serious to establish a violation of the Eighth Amendment.  The undisputed evidence presented at the hearing was that the facility maintained a pest control contract as it was required to do by TDOC policy.  The testimony showed that prison officials, including the Defendants who managed MLCC during the relevant time period, would call the pest control company as needed.  Plaintiff's expert Goodman documented these efforts in his report.  It was also undisputed that Defendants provided traps for mice and rats to

---

2010 WL 3001708, at *5 (W.D. Ky. July 27, 2010) (bed bugs in a cell for a short period of time "unpleasant" but not "objectively serious enough to establish a constitutional violation"); *Davis v. Little*, No. 09-2045, 2009 WL 2849641, at *7 (W.D. Tenn. Sept. 1, 2009); *Yoder v. Seals*, No. 07-cv-436, 2009 WL 737099, at *3 (E.D. Tenn. Mar. 19, 2009) (dismissing claims about bugs and spiders in cell as "the inconveniences and general living conditions associated with incarceration").

    [36] *Wilson*, 893 F.2d 861, at 866-67.  *See also Anderson v. Shelby County Government*, No. 03-2650, 2009 WL 3241676, at *11 (W.D. Tenn. Sept. 30, 2009) (jail's pest control efforts precluded inference of deliberate indifference); *Tucker*, 955 F. Supp. at 816.

    [37] *Id*. (citation omitted).

be used in cells and that TDOC policy prohibited Defendants from providing pest spray or poison.  Based on Defendants' ongoing efforts to deal with the pest problem MLCC, the Court holds that Plaintiff cannot show that Defendants were deliberately indifferent to her health and safety.  On the contrary, to the extent that Defendants could not eliminate the pest problem, Defendants' conduct was negligent at most.  Therefore, this claim is dismissed.

### B.  Lack of Recreation

Plaintiff has alleged a lack of recreation opportunities at the MLCC (#181353), specifically, that there is not adequate space or equipment for inmates to exercise.  The Sixth Circuit has held that the provision of limited recreation opportunities is not an objectively serious enough deprivation to rise to the level of a constitutional violation.[38]  Plaintiff presented very little evidence about the recreational opportunities she had at MLCC.  Miller, Defendant's expert and TDOC's director of compliance, stated that there were many activities at the facility as well as a gymnasium, treadmills, and a variety of table games.  There was no evidence that Plaintiff was denied recreation altogether.  At most, Plaintiff could only prove intermittent or temporary deprivations of recreation, which do not rise to a violation of the Eighth Amendment.  Additionally, Plaintiff offered no proof that Defendants acted with deliberate indifference.  Therefore, Plaintiff's claim about lack of recreation is dismissed.

### C.  Ice

Next Plaintiff alleges that officials failed to provide ice to inmates on a daily basis during

---

[38] *Dean v. Campbell*, No. 97-5955, 1998 WL 466137, at *2 (Table) (6th Cir. July 30, 1998) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)) ("limited recreation opportunities" not "the type of extreme deprivations which are necessary" for a constitutional deprivation); *Thompson v. County of Medina, Oh.*, 29 F.3d 238, 243-44 (6th Cir.1994) (restrictions on exercise not a violation of Eighth Amendment).

the hottest months of the year (#181613).  The evidence showed that the temperatures in some parts of the facility were very high at certain times of the summer.  However, the evidence also showed that other parts of the facility did have air conditioning.  In the areas where there was no air conditioning, Defendants allowed inmates to have fans in their cells and provided ice.  It was undisputed that inmates did not always receive ice on a daily basis.  Notably Plaintiff does not allege that ice was not provided at all or that inmates went more than a matter of days without ice.  The Supreme Court has made clear that the constitutionality of a specific condition is dependent on the length of time an inmate must endure it.[39]  "Put simply, temporary inconveniences and discomforts do not rise to the level of a constitutional violation."[40]  The Court finds that a deprivation of ice for a matter of days does not rise to the level of an Eighth Amendment violation.  Therefore, this claim is dismissed.

### D.  Padlocks on Cell Doors

Plaintiff has alleged that the MLCC's use of padlocks to secure each cell door poses a hazard to inmates, especially in the event of a fire (#182383).  The Supreme Court has commented, "In determining when prison conditions pass beyond legitimate punishment and

---

[39] *Bell v. Wolfish,* 441 U.S. 520, 543, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("Our conclusion [that double-bunking is constitutionally permissible] is further buttressed by the detainees' length of stay. . . . Nearly all of the detainees are released within sixty days."); *Hutto v. Finney,* 437 U.S. 678, 686-87, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Holloway v. Gunnell,* 685 F.2d 150, 156 (5th Cir.1982) ("allegations of two days of discomfort are not sufficient to state a claim of constitutional dimension").

[40] *Starnes v. Green Co. Sheriff's Dep't*, No. 08-cv-244, 2010 WL 2165368, at *4 (E.D. Tenn. May 26, 2010) (quoting  *Adams v. Pate,* 445 F.2d 105, 108-09 (7th Cir. 1971)).

become cruel and unusual, the touchstone is the effect upon the imprisoned."[41]  Among the conditions the courts may analyze are inmate safety including "fire protection" and "emergency evacuation."[42]  Many courts have held that malfunctioning or lock-up procedures posing a hazard to inmates during a fire emergency may satisfy the objective prong of an Eighth Amendment violation.[43]  During the evidentiary hearing, Plaintiff's expert witness stated that the use of padlocks was very concerning to him and was a serious theat to the safety of the inmates at MLCC.  The Court must stress that of all the conditions Plaintiff complained of at MLCC, the potential hazard of padlocking cell doors was the most troubling to the Court.

Nevertheless, the Court holds that Plaintiff failed to present any evidence of Defendants' deliberate indifference to her safety in the event of a fire.  Defendants adduced evidence that MLCC has been ACA-accredited since 1988.  The facility was re-accredited in 2006 and 2009.  It is undisputed that ACA auditors were aware of the padlocks and the MLCC's procedures for fire safety.  There was also compelling evidence that the state fire marshal had completed annual inspections at MLCC and never concluded that the padlocks violated the fire code and has never ordered padlocks removed from cell doors.  In fact, Miller's unrefuted testimony stated that the fire marshal participated in the original decision to use padlocks at MLCC in the first place.  It was also undisputed that MLCC had the state fire marshal's approval for its evacuation plan

---

[41] *Rhodes v. Chapman*, 452 U.S. 337, 364, 101 S.Ct. 2392, 2408 (1981) (quotation and quotation marks omitted).

[42] *Id.*

[43] *Hadix v. Johnson*, 367 F.3d 513, 528 (6th Cir. 2004) (collecting cases and remanding for determination of whether remedies undertaken by prison officials ameliorated constitutional violations).

and emergency procedures.  In light of the ACA accreditation and approval of the state fire marshal, it cannot be said that Defendants disregarded a significant risk to Plaintiff's safety by using a padlock on her cell door.  Even if the Court concluded that the use of padlocks satisfied the objective component of Plaintiff's claim, Plaintiff could not prove that Defendants acted with deliberate indifference.  Therefore, this claim is dismissed.

### E.  Standing Water in Showers

Plaintiff has alleged that she and other inmates were forced to use showers at the facility with standing water (#182781).   Many courts have concluded that standing waters in a prison shower do not pose a risk of sufficiently serious harm or excessive risk to the health or safety of inmates.[44]  Thus, Plaintiff's claims about standing water in the showers are be dismissed.

### F. Security in the Library and Plaintiff's Assault in the Library

Finally, Plaintiff has alleged that prison officials failed to provide security in the law library at the facility and that as a result of the lack of security, Plaintiff was assaulted there by another inmate (#182958 and 183410).  The allegation that a facility housed some violent

---

[44] *Reynolds v. Powell,* 370 F.3d 1028, 1031-32 (10th Cir. 2004); *Stanley v. Page*, 44 F. App'x 13, 15, 2002 WL 1940159, at *1 (7th Cir. 2002); *Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir. 1996) ("[A]n inch or two of water in the shower, even where one has a sore toe, is not an 'excessive risk to inmate health or safety'. . . ."); *Rodriguez v. Mercer County*, No. 09-4505, 2010 WL 920153, at *9 (D.N.J. Mar. 9, 2010); *Weaver v. Petray*, No. 08-5195, 2010 WL 909589, at *6 (W.D. Ark. Mar. 11, 2010); *Wilson v. Pearl River County*, No. 08-1353, 2010 WL 235027, at *5 (S.D. Miss. Jan. 15, 2010); *Jones v. Lockett*, No. 08-16, 2009 WL 2232812, at *13 (W.D. Pa. July 23, 2009); *Banks v. York*, 515 F. Supp. 2d 89, 106 (D.D.C. 2007) (holding that allegation that "showers in [plaintiff's] housing unit were infested with bacteria, standing water, and various diseases" was not objectively serious enough).  *But see Lancaster v. Tilton*, No, 79-01630, 2007 WL 1807825, at *26 (N.D. Cal. June 21, 2007) ("minimum standards of decency require that lockup inmates without hot running water in their cells be accorded showers three times per week in facilities reasonably free of standing water, fungus, mold and mildew").

prisoners or that violence among inmates would sometimes occur does not establish an Eighth Amendment violation.[45]  The Sixth Circuit has rejected similar claims about inmate safety where a plaintiff has not alleged or cannot show "pervasiveness of inmate-on-inmate violence" or that similar attacks occurred during a specific prison official's tenure.[46]  Furthermore, in order to establish deliberate indifference, a plaintiff must show that a prison official had personal knowledge of a particular problem specific to the plaintiff or of threats against the plaintiff.[47]  In so far as a prisoner alleges that an assault occurred due to a lack of classification system, the prisoner must show a relationship between specific instances of physical violence between inmates and the facility's lack of a classification system.[48]

The Court holds that Plaintiff has failed to state her claim for lack of security in the law library.  As an initial matter, Plaintiff identified a MLCC employee named Mitchell in her grievance, and not Defendants.  Plaintiff adduced no evidence that Defendants knew of a substantial risk of assault on Plaintiff.  As for Plaintiff's claim about a lack of security in the library, there was no testimony about any danger or risk in the library that would rise to level of deliberate indifference.  Therefore, this claim is dismissed.

## III.  Plaintiff's State Law Claims for Malicious and Intentional Conduct

The Court holds that for the same reasons that Plaintiff cannot show deliberate

---

[45] *Hester v. Morgan*, 52 F. App'x 220, 222-23, 2002 WL 31640469, at **2-3 (6th Cir. 2002) (citing *Woods,* 110 F.3d at 1225; *Gibson v. Foltz,* 963 F.2d 851, 854 (6th Cir. 1992)) .

[46] *Hester*, 52 F. App'x at 222-23 (6th Cir. 2002).

[47] *Id*. at 224.

[48] *Thompson*, 29 F.3d at 242-43.

indifference to her serious health needs, Plaintiff's claims under Tennessee tort law for malicious and intentional conduct also fail.  Although state officials enjoy immunity from most tort claims, Tenn. Code Ann. § 9-8-307(h) removes immunity for claims for "willful, malicious, or criminal acts or omissions or for acts or omissions done for personal gain."  The Sixth Circuit has stated that "[i]n order to be held liable for willful and malicious conduct [under § 9-8-307(h)], one must act intentionally, deliberately, and purposefully. Willful misconduct requires more than negligence; it suggests 'deliberation and intentional wrong-doing.'"[49] The Court finds that the standard to prove this tort is arguably more demanding than § 1983's deliberate indifference standard.  Having held that Plaintiff's has failed to make the showing of deliberate indifference, Plaintiff's tort claims for malicious and intentional conduct are dismissed.

## CONCLUSION

Each of the foregoing claims of Plaintiff's Complaint fails to state a claim upon which

---

[49] *Cagle v. United States*, 937 F.2d 1073, 1076-77 (6th Cir. 1991) (citing *Kingsport v. Quillen,* 512 S.W.2d 569, 573 (Tenn.1974) and *Nashville, C. & S. L.R. Co. v. Wright,* 250 S.W. 903 (Tenn.1923)).

relief may be granted.  Therefore, all claims are **DISMISSED** pursuant to 28 U.S.C. §

1915(e)(2)(B)(ii).

       **IT IS SO ORDERED.**

                                             **s/ S. Thomas Anderson**
                                           S. THOMAS ANDERSON
                                           UNITED STATES DISTRICT JUDGE

                                           Date:   August 31st, 2010.